OPINION OF THE COURT
Jones, J.
Judgment and order affirmed, with $25 costs.
The plaintiff, Ivy Ashley, had been employed as a nurses’ aide by Beth Israel Hospital for more than 10 years when she was injured, on November 18, 1980, as she sat alone in the Woodlawn Express subway train at the Utica Avenue Station in Brooklyn. Ms. Ashley enjoyed good health until the day of the accident. During the decade of her employment at Beth Israel Hospital she had regularly performed her duties as a nurses’ aide. As plaintiff sat in the first car behind the motorman’s cab, the train started, and suddenly came to a "violent stop”. The sudden jolt broke her grip on the rail she was holding, struck her head violently against the cab and threw her to the floor. Although she felt dizzy, Ms. Ashley got up and resumed the same seat. The train started again, and soon came to another "violent stop”; causing plaintiff to sustain another blow to her head. She apparently lost consciousness. When she regained her senses, Ms. Ashley found a woman passenger applying smelling salts to her nose. This fellow passenger testified that plaintiff complained about "Her head”. When the subway train reached the 14th Street Station two policemen assisted plaintiff to an ambulance. She was removed to Beth Israel Hospital for emergency medical treatment. A physician examined her and ordered her to a bed in the hospital. The hospital records confirmed that Ms. Ashley appeared to be disoriented on admission. Plaintiff said that she did not recall anything that was done for her or to her in the hospital. On the following day plaintiff was discharged from Beth Israel Hospital and taken home in a taxicab. Ms. Ashley testified that she could not function normally. She remained at home, in bed, for several days, using ice packs on her head. After four days she consulted her physician, Dr. Folk, who continued to treat her, over time, for "cervicular radiculitis”, "lumbar radiculitis” and "post-concussion syndrome”, viz., "neck and back injuries”; "muscle spasms”, and "sprains”. Dr. Folk testified that her injuries were referrable to the accident. During the ensuing seven months, Ms. Ashley *3 claimed that she was unable to resume her duties as a nurses’ aide; while Dr. Folk continued to treat her "cervicular radiculitis”, "lumbar radiculitis” and "post-concussion syndrome”, viz., "neck and back injuries”; "muscle spasms”, and "sprains” with muscle relaxant drugs, analgesics for neck pain, and heat therapy; injuries that he said resulted "from a blow between the mass of the brain and the stem.” Dr. Folk stated his opinion that the X rays taken of the plaintiffs spine soon after the accident showed a straightening of the "Lordotic Curve”; that was a sign of "tremendous spasm, tremendous shock” to the nerves and muscles of her neck. Dr. Folk testified that when he examined plaintiff in July 1980, 18 months after the accident, he found "exacerbation of her condition, and evidence of tenderness and spasm.” Dr. Charles Ogunro, a neurologist, who treated the plaintiff, testified that Ms. Ashley sustained permanent brain damage, and "limitation (of) her intellectual function.” Both physicians expressed the opinion that the plaintiff had suffered permanent injuries to her brain, neck and back; that caused a diminution of her powers of memory and concentration; with the probability of a continued pattern of recurrent headaches, dizziness and back pains; all referrable to the accident.
The defendant presented no medical evidence or other proof to controvert the opinions of plaintiffs treating physicians.
Ms. Ashley, a 49-year-old widow, had worked the night shift at Beth Israel Hospital for 10 years prior to the day of her accident. She testified, at the trial, that she continued to experience pain in her neck, back and head; that she suffered frequent dizzy spells, pains in the lower back. She said that she could not continue her recreational sewing, and certain other social activities. Nevertheless, seven months after the accident, she resumed her occupation as a nurses’ aide, and continued in that gainful and exacting enterprise up to the date of trial.
The Trial Judge charged the jury that if they found that plaintiff had sustained permanent injuries, they should take into account her age, condition and life expectancy of 24 years.
The jury deliberated for more than 10 hours, and returned a verdict for plaintiff in the sum of $359,000, thereby indicating that they credited the plaintiffs account of her injuries, and that they accepted the expert testimony of the physicians who said that she sustained a permanent loss of memory and *4 damage to other intellectual functions. The Trial Judge, who observed the witnesses and was therefore in position to evaluate their testimony and observe the plaintiff, as a whilom trier of the facts himself, found the jury verdict to be excessive and reduced it to $175,000. Taking into account that Ms. Ashley could not resume her work as a nurses’ aide for seven months; lost $7,000 in wages during the seven-month period that she was incapacitated; continued under regular treatment by various physicians until shortly before the trial, three years after the accident, and was said to have sustained some permanent loss of memory and other disabilities, this court considers that the reduction of the verdict to $175,000 was fair and reasonable, under the circumstances.
CPLR 5522 requires that an appellate court shall briefly state the grounds[1] of its decision when reversing or modifying a judgment or order without opinion. This statute was amended by the New York State Legislature in 1977 to clarify and explain the decisions of appellate judges when they undertake to "modify, or reverse” the judgment or orders of lower courts.[2], [3] The amended statute was also intended to "educate” the parties, and the public, in regard to the appro *5 priate evaluation of injuries[4] (cf. Senko v Fonda, 53 AD2d 638, 639). In the Senko case, the Appellate Division, Second Department, reaffirmed a 1918 decision of that court, viz., Fried v New York, New Haven & Hartford R. R. Co. (183 App Div 115, 125, affd 230 NY 619), which declared that in determining whether a verdict is excessive or inadequate: "A long course of practice, numerous verdicts rendered year after year, orders made by trial justices approving or disapproving them, decisions on the subject by appellate courts, furnish to the judicial mind some indication of the consensus of opinion of jurors and courts as to the proper relation between the character of the injury and the amount of compensation awarded.”
An award by a jury for personal injuries is obviously based on the jury’s determination of many questions of fact presented, at length, during the trial. An appellate court should not interfere with a jury’s verdict, on grounds of excessiveness, therefore, save in exceptional cases (James v Shanley, 73 AD2d 752). Otherwise the exquisite function of the trial jury in our judicial system; to assess the quantum of damages and find the facts, might be usurped, subtly, by the conceited opinions of remote judges who have never seen the witnesses nor evaluated and conflicting claims of the parties on the basis of living proof. "The jury is the primary tribunal to assess the quantum of damages, and except in cases of clear abuse of that duty, courts should be reluctant to interfere”, especially where, in the exercise of well-established powers, the trial judge has already reduced the verdict once (Luedeke v New York Cent. & Hudson Riv. R. R. Co., 164 App Div 104, 107-108 [4th Dept 1914]). Jury verdicts have acquired a relative sacrosanctity in American jurisprudence because they reflect the decent respect that our judges have for the discrete and informed judgment of average citizens-jurors, who have been assembled from all walks of life to do justice, according to their "lights”. Moreover, the opinion of a trial judge, who has "tried the case to a jury”, as the saying goes; who is, there *6 fore, in a refined sense, a "trier of the facts”, should not be casually set aside by appellate judges, without a clear statement of the grounds of their opinion.
Pino, P. J., concurs; Hirsch, J., taking no part.

. Webster’s Third New International Dictionary (unabridged 1981) defines "grounds” as: "[T]he foundation or basis on which knowledge, belief, or conviction rests: a premise, reason, or collection of data, upon which something (as a legal * * * argument) is made to rely for cogency or validity”.

. The Study Group on Appellate Justice in New York, at the request of the New York Court of Appeals, assessed the need for changes in appellate jurisdiction of New York, and issued a report in July 1982, entitled "Failure To State The Grounds of Decision”, which states, inter alia:
"CPLR 5522 and its antecedents have long required that an appellate court reversing or modifying a judgment or order without opinion in a civil action shall state the grounds of its decision. Until 1975 there was no requirement for such a statement if a decision were affirmed. However, in response to complaints of the bar regarding 'anopac’ affirmances (i.e., 'affirmed, No opinion, all concur’) and the inability of counsel to denounce the actual reasons for decisions * * *
"The Study Group * * * subscribe(s) to the view that the integrity of the process requires that appellate courts state the reasons for their decisions * * * We urge that, with or without a mandate in the CPLR, the Appellate Division should strive to provide litigants both in civil and criminal cases, with at least a summary of the grounds for decision of every appeal.”

. The legislative purpose of CPLR 5522 was to clarify the bases upon which appellate courts decide cases, and to add to the knowledge of attorneys. (Cf. Memorandum of Assemblyman Thomas J. Culhane, 1975 NY Legis Ann, at 55; 1977 Judicial Conference Report to the Legislature, Proposal No. 3, McKinney’s 1977 Session Laws of NY, at 2592.)

. In the textbook Justice on Appeal (at 31 [West Publishing Co. 1976]) Professors Carrington, Meador and Rosenberg express their view that:
"[L]itigants and the public are reassured when they can see that the determination emerged at the end of a reasoning process that is explicitly stated, rather than as an imperious ukase without a nod to law or a need to justify”.
"We recommend * * * Every decision of an appeal should be accompanied by a statement of reasons, however brief’.